JUSTICE McKINNON,
dissenting.
¶31 I dissent from the Court’s decision that there was no particularized suspicion to approach Hoover’s vehicle and conduct an investigatory stop. In my opinion, Rodriguez is not distinguishable from the instant case and the Court’s reliance on Graham, where police did not suspect unlawful activity, and Kaufman, which involved an extended detention, is misplaced. Pivotal to the analysis is Hoover’s concession that he was “seized” by law enforcement upon their initial contact.[1] Thus, the only issue to resolve is whether police had particularized suspicion of unlawful activity—here, breaking and entering storage units and/or illegal drug use—at the time police announced their presence to Hoover.
¶32 The Court does not conclude that any of the Justice Court’s findings of fact are clearly erroneous. Those facts, which are undisputed, establish that Sgt. Meredith is a well-seasoned police officer with 18 years of patrol duty. On August 2, 2013, at around midnight, he was on a swing shift and patrolling area businesses and parking lots in the vicinity of AAA Mini Storage. The storage compartments are arranged in rows and do not have security, a gate, or a fence. Also, there are no immediate businesses or homes around AAA Mini Storage and the storage complex is otherwise remote and *548 has no lighting. During the course of Sgt. Meredith’s experience and duties as a patrol officer, he is aware that storage units in the area are frequently broken into and their contents stolen. Sgt. Meredith is also aware that illegal drug activity takes place in vehicles parked in remote areas, at night.
¶33 On the night in question, Sgt. Meredith observed a truck parked between rows of the storage units at AAA Mini Storage with the vehicle’s lights off. Based on the truck’s location in relation to the storage units, the time of night, and his knowledge of criminal activity occurring at storage units, Sgt. Meredith called for backup in order to investigate his suspicions that unlawful criminal activity might be taking place, i.e. breaking and entering of the storage units. Sgt. Meredith and other officers approached Hoover’s truck on foot. Approximately 15 yards away from the vehicle, Sgt. Meredith discerned that there were two occupants in the truck who were seated apart: one in the driver’s seat and the other in the passenger’s seat. The driver was moving his hands and was “concentrating” on something in his lap or in the area of the steering wheel. Sgt. Meredith testified he was now concerned the driver was “loading up” a marijuana bowl or a syringe to inject meth or another illegal drug. Sgt. Meredith announced his presence and shined his flashlight into the cab of the vehicle. Hoover was in the driver’s seat and a female was in the passenger’s seat. This is the point police made initial contact with Hoover’s truck. Accordingly, due to Hoover’s concession, any other information gathered by police following this initial contact is irrelevant and not appropriate for our analysis.
¶34 The above facts are not in dispute and the analysis is straightforward. Sgt. Meredith is authorized to conduct an investigatory stop if he has (1) objective data from which an experienced officer can make certain inferences; and (2) a resulting particularized suspicion that the occupant of the vehicle is engaged in wrongdoing. Rodriguez, ¶ 17; State v. Hilgendorf, 2009 MT 158, ¶ 13, 350 Mont. 412, 208 P.3d 401. “Whether particularized suspicion exists is evaluated under the totality of the circumstances confronting the officer at the time of the stop, and requires consideration of the quantity or content of the information available to the officer and the quality or degree of reliability of that information.” City of Missoula v. Moore, 2011 MT 61, ¶ 16, 360 Mont. 22, 251 P.3d 679. From this data, “a trained officer draws inferences and makes deductions—inferences and deductions that might well elude an untrained person.” Cortez, 449 U.S. at 418, 101 S. Ct. at 695.
¶35 In Rodriguez, the following facts were set forth by this Court and *549 found to establish particularized suspicion:
Deputy Stineford observed Rodriguez’s vehicle located outside Kurt’s Polaris at 11:30 p.m., well after the business had closed. He testified that he observed Rodriguez’s vehicle, with its headlights off, rolling slowly through the parking lot of a business that contained a significant amount of expensive inventory. Deputy Stineford testified that his experience taught him that burglaries of businesses occur at night and that no vehicles were typically present in the business’s parking lot at night. These objective and articulable observations reasonably led Deputy Stineford to possess the requisite particularized suspicion that Rodriguez was casing Kurt’s Polaris to commit burglary. The District Court did not err in concluding that Deputy Stineford was justified in conducting an investigative stop of Rodriguez.
Rodriguez, ¶ 19. The Court attempts to distinguish Rodriguez by observing that Rodriguez’s vehicle was “creeping” along and casing a business. Opinion, ¶ 21. The Court states that, here, “the couple” parked in a secluded spot to “engage in consensual intimacy on a warm summer night.” Opinion, ¶ 2. The Court’s attempt to distinguish Rodriguez, however, cannot be supported by either the facts here or in Rodriguez.
¶36 In the instant proceeding, the objective data consists of the following: Hoover purposely secluded and isolated his vehicle; he turned off his headlights and any other vehicle illumination in order to avoid detection; he parked between rows of the storage units to further seclude himself and avoid detection; it was dark and late at night; Hoover chose to isolate himself in a private business area where people pay to store their belongings; and Sgt. Meredith testified that, in his experience, breaking into storage units is a frequent occurrence in the area. In addition, Sgt. Meredith testified that as he approached Hoover’s vehicle he observed movement consistent with the ingestion of illegal drugs, either loading a pipe or filling a syringe. Based on this objective data, an experienced officer such as Sgt. Meredith could reasonably infer that Hoover was involved in breaking into a storage unit or ingesting illegal drugs. I respectfully disagree with the Court’s conclusion that Rodriguez is “not sufficiently analogous” and is “factually distinguishable here.” Opinion, ¶ 22. The Court appears to distinguish Rodriguez because the vehicle was “creeping” along. The Court fails, however, to consider the totality of the circumstances and the reasonable inferences that Sgt. Meredith, a trained police officer, may draw.
¶37 In Hilgendorf we found the following facts were sufficient to *550 establish particularized suspicion:
Hilgendorf does not contest that his car was parked near a business at 2:00 a.m., when all of the area businesses were closed, that the area was known for its thefts from and burglaries of the businesses, or that he quickly left upon the second approach of the police vehicle. ... Romero also observed that both Hilgendorf and his passenger were moving around inside the vehicle as if trying to conceal something in the vehicle. Denying that he initiated the stop for a traffic violation, Romero testified the stop was made because the occupants “were busy moving around inside the vehicle” and that “the actions they were taking, a normal person wouldn’t be doing,” leading to his conclusion that “I felt there could be something going on, like somebody committing a theft” and his decision to initiate a stop. These observations, combined with what Romero had initially observed, were objective data from which Romero could make inferences about the possibility of a crime and come to a resulting suspicion that a theft could be in progress.
Hilgendorf, ¶ 18. Our analysis in Rodriguez is consistent with Hilgendorf and stands in stark contrast to the Court’s conclusion here that there was only “an undeveloped, generalized suspicion of criminal activity.” Opinion, ¶ 19. Our analysis fails particularly when we draw such a conclusion after we have noted that “[ujnder these circumstances and based on his extensive law enforcement experience, Meredith certainly articulated a reasonable suspicion that an illegal break-in might possibly be in progress, thus warranting additional investigation in the performance of his duty.” Opinion, ¶ 19. By approaching the parked vehicle, Sgt. Meredith was, in fact, conducting that additional investigation. That Sgt. Meredith’s initial suspicions were subsequently dispelled through further investigation does not affect the objective data and reasonable inferences existing immediately prior to Sgt. Meredith’s contact with Hoover. The Court appears to have difficulty with these important distinctions.
¶38 As another example, in Brown v. State this Court found there was particularized suspicion to justify an investigatory stop based on the following:
At approximately 2:51 a.m. on June 10, 2007, Hill County Deputy Sheriff Stephen Martin observed a white Ford pickup “barely moving” along a public roadway with its lights on. As Deputy Martin watched, the pickup suddenly pulled over, came to a stop and shut off its lights. Concerned that the occupants of the pickup were experiencing problems, Martin pulled in behind it, *551 exited his vehicle and approached the driver’s side of the pickup.
Brown, who was in the drivers’ seat, was the only person in the pickup. Deputy Martin noted that no structures or other persons were in the immediate vicinity. When Brown rolled down his window, Deputy Martin immediately detected the odor of alcohol.
2009 MT 64, ¶¶ 3-4, 349 Mont. 408, 203 P.3d 842 (footnote omitted). We explained in Brown that “[t]he question is not whether any one of [defendant’s] driving aberrations was itself‘illegal’ but rather, whether [the officer] could point to specific and articulable fact which, taken together with reasonable inferences from those facts, reasonably warrant the intrusion.” Brown, ¶ 22 (citing Clark v. State ex rel. Driver Improvement Bureau, 2005 MT 65, ¶ 9, 326 Mont. 278, 103 P.3d 244). Further, “a peace officer’s experience and training may be a factor in determining what sort of reasonable inferences he or she is entitled to make from his or her objective observations ....” Brown, ¶ 20. Here, although no single fact standing by itself established particularized suspicion of wrongdoing, Sgt. Meredith’s considerable experience in patrol and awareness of burglaries of area storage units—in conjunction with Hoover’s efforts to seclude himself late at night in a storage unit area—established particularized suspicion for further investigation.
¶39 Lastly, the Court attempts to draw support from Graham and Kaufman. In Graham, however, our decision turned on the deputy’s failure to articulate any criminal activity for which the deputy was suspicious. In fact, we explained “it bears repeating that Officer Juhl herself did not approach the vehicle because she believed a crime was being committed, as § 46-5-401(1), MCA requires; she did so because she thought their behavior was ‘inappropriate’ and she wanted to ‘move them along.’ ” Graham, ¶ 22. Noting that “the Legislature has not yet outlawed the type of conduct in which Graham and Strauser were engaging!,]” we held that “[i]t is not this Court’s role to inject particularized suspicion when the officer, by her own admission, did not have it.” Graham, ¶¶ 21-22. In contrast to Graham, Sgt. Meredith believed that breaking and entering storage units and/or illegal drug use—both unlawful activities—were potentially occurring. The Court confuses the Graham extended detention analysis with the events occurring here. See Opinion, ¶ 28. Our statement that “[w]ith their initial asserted justification gone, the officers neither saw nor articulated any particularized indication of anything other than lawful sexual activity between consenting adults []” demonstrates the confusion in our analysis, in light of Hoover’s concession that he was seized once police initiated contact with his vehicle. Opinion, ¶ 28. *552 What the officers learned after their initial contact with Hoover’s vehicle is irrelevant to the analysis.
¶40 Similarly, in Kaufman, one tail lamp on Kaufman’s vehicle emitted a significantly brighter light than the other. Initially, the deputy investigating believed the driver either might be applying the brakes and gas simultaneously or experiencing a lighting malfunction. However, after the officer signaled the driver to pull over, the officer noticed that the turn signals of the Kaufman’s vehicle were, in fact, operating properly and both stop lamps were fully functional. We held that “any suspicion [the officer] may have had that the lighting system was malfunctioning was quelled completely prior to the actual stop.” Kaufman, ¶ 20. Thus, law enforcement in Kaufman no longer suspected Kaufman of violating any traffic safety laws by the time Kaufman was pulled over on the highway. In the instant proceeding, however, Sgt. Meredith had not dispelled his suspicions of Hoover’s involvement in wrongdoing prior to his contact with Hoover. Police did not dispel their suspicions of criminal activity—breaking and entering and/or using drugs—until after they had initiated contact. Hoover’s concession that a seizure occurred at the point of initial contact with police rendered any subsequent de-escalation of suspicious circumstances inappropriate for consideration by the Court.
¶41 In my opinion, the Court’s description of the objective data Sgt. Meredith relied upon to draw reasonable inferences of criminal activity as “only” a “generalized” suspicion of wrongdoing does the citizens of this State a disservice, let alone being inconsistent with this Court’s precedent. Citizens rely on the expertise of police to follow up on their particularized suspicions with investigations which dispel their suspicions and maintain the security of their communities. I disagree with the Court’s conclusion that these facts and the inferences drawn therefrom did not warrant further investigation by police; that is, approaching the vehicle to inquire of Hoover what he was doing. This is exactly what Sgt. Meredith did.
¶42 I respectfully dissent from the Court’s decision concluding otherwise.

 Hence, the District Court, the Honorable Katherine R. Curtis presiding, did not review any facts following Sgt. Meredith announcing his presence and shining his flashlight into the cab of the truck.