FILED

08/17/2021

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 19-0700

DA 19-0700

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2021 MT 205N

STATE OF MONTANA,

      Plaintiff and Appellee,

    v.

BRENNAN ADRIAN JONES,

      Defendant and Appellant.


APPEAL FROM:    District Court of the Twentieth Judicial District,
                    In and For the County of Lake, Cause No. DC-17-355
                    Honorable Deborah Kim Christopher, Presiding Judge


COUNSEL OF RECORD:

      For Appellant:

            Chad Wright, Appellate Defender, Michael Marchesini, Assistant
            Appellate Defender, Helena, Montana

      For Appellee:

            Austin Knudsen, Montana Attorney General, Brad Fjeldheim, Assistant
            Attorney General, Helena, Montana

            Steven Eschenbacher, Lake County Attorney, Polson, Montana


                         Submitted on Briefs:  July 21, 2021

                               Decided:  August 17, 2021


Filed:

                        _____
                                 Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1 Pursuant to Section I, Paragraph 3(c), Montana Supreme Court Internal Operating Rules, this case is decided by memorandum opinion and shall not be cited and does not serve as precedent. Its case title, cause number, and disposition shall be included in this Court's quarterly list of noncitable cases published in the Pacific Reporter and Montana Reports.

¶2 A jury convicted Brennan A. Jones of misdemeanor Partner or Family Member Assault, felony Assault with Weapon, and felony Intimidation. Jones appeals his conviction and asks the Court to reverse and remand for a new trial, or in the alternative, remand for resentencing. We affirm.

¶3 During November 2017, Jones was living with his mother, Lela, and her partner, Meredit Mayorga.[1] One night in November, Jones was downstairs in the house drinking, smoking, and throwing knives at a target. Lela was upstairs with Mayorga, who was watching television. Jones asked Lela to come downstairs because he wanted to teach her how to throw knives. Lela went downstairs and began throwing knives. At one point, Jones told Lela to stay downstairs and then ran upstairs and yelled at Mayorga. Jones came back downstairs and continued to insist Lela throw knives. Jones then went back upstairs, yelled at Mayorga again, and accused Mayorga of recording him with a tablet. Lela went back upstairs and told Jones to stop yelling at Mayorga and to leave him alone. As Jones was yelling, Mayorga said he was going to bed. Lela continued to

---

[1] Mayorga, who was 72 years old at the time of the incident, passed away before trial for reasons unrelated to the charged offenses.

tell Jones to leave Mayorga alone and Jones grabbed Lela by the throat, threw her, and told her to stay out of his way.

¶4      During the incident, Mayorga ended up on the floor. As Mayorga hid on the floor, Jones grabbed Lela's throat again and cut off her air supply. Lela said Jones told her "he was going to put his thumb through my windpipe if I didn't shut up and stay out of his way." Lela testified that she was afraid: "I have never through the years of this had ever felt that afraid of my son. But this was different. He actually put his hand on [Mayorga] and he hurt him." Jones then stood over Mayorga with one of the throwing knives in his hand. He held the knife over Mayorga's face, threatening him as if he was going to drop the knife on Mayorga. Jones asked Mayorga if he wanted to live, to which Mayorga responded, "yes." Jones asked him if he wanted to see his children again and Mayorga responded, "yes." Jones asked him if he wanted to see his grandchildren again, and Mayorga, again, answered, "yes." Lela testified, "I just knew in my heart that eventually after this he would kill me."

¶5      Eventually Jones realized what he was doing and stopped. Jones picked Mayorga up "like he was a baby and put him in bed." Jones kept asking if Mayorga wanted him to call his son, but Mayorga didn't want his son to know anything about the incident. Jones told Lela under his breath that "if [Mayorga] says yes, . . . he won't have a son anymore either." Jones told Lela not to call the cops and that he could have her bled out by the time the cops arrived.

¶6      Lela did not immediately call the police because she did not want Jones to retaliate. Instead, she waited a few days until she had a doctor's appointment. At the

appointment, she told her nurse what Jones had done and showed the nurse bruises on her arms and neck and a wound on her leg that she sustained during the assault. The nurse told Lela to report the incident to the police. Lela testified she then went to the police station and reported the incident.

¶7 The State charged Jones with felony Strangulation of a Partner or Family Member, felony Tampering with Witnesses and Informants,[2] felony Assault with Weapon, and felony Intimidation. In February 2018, Jones entered a guilty plea to two counts of felony Criminal Endangerment and the State agreed to dismiss the other charges. Jones moved to withdraw his plea, which the District Court granted, and the case proceeded to trial.[3] At trial, Lela was the State's only witness.

**Closing Arguments**

¶8 The State limited its initial closing argument to the application of Lela's testimony to the elements of the charged offenses. In Jones' closing argument, defense counsel attacked Lela's credibility. Jones argued Lela's testimony was inconsistent with her initial report to medical personnel and the police. On rebuttal, the State explained any difficulty Lela had in her testimony was based on the difficulties she had in reporting her son's crimes to the police and then having to testify against her son.

---

[2] The State later dismissed the tampering charge.

[3] During the plea colloquy, the District Court failed to advise Jones of the maximum potential penalties he faced on the two counts of felony Criminal Endangerment. Jones moved to withdraw his guilty plea on the ground it was not knowingly, voluntarily, and intelligently entered. In a March 2019 order, the District Court acknowledged its error and allowed Jones to withdraw his plea.

4

Like I said, each of us have our roles. [Defense counsel's] job is to try and minimize, distract, deflect. He's done a good job. He's tried the best he can. But I think you have to ask yourself one basic question. Why would a mother who loves her son falsely accuse him of this? Fact is, Lela's been abused twice. She was abused back in November 2017, and she was abused again by having to come to trial and testify against her own son. She did not want to do that. But she did. And she did it because she loves her son and she fears her son, as she said.

I'd like to—most of you when we were talking earlier in voir dire understand abuse victims have a hard time. They don't want to have to live through that abuse again. And that's what we've made Lela come back in to have to do to have this trial. She has to deal with the memories of what happened.

The State reiterated it was the jury's job to assess the credibility of the witness and reread a portion of the applicable jury instruction. Before turning to the verdict form, the prosecutor stated, "We had one witness. And if you believe her, then you have to convict." Jones did not object to any of the State's closing argument statements.

¶9 The jury found Jones guilty of felony Assault with Weapon, felony Intimidation, and misdemeanor Partner or Family Member Assault—a lesser included offense of Strangulation.

**Sentencing**

¶10 The District Court sentenced Jones to one year to the Lake County Jail for misdemeanor Partner or Family Member Assault, 20 years to Montana State Prison for Felony Assault with Weapon, and 10 years to Montana State Prison for felony Intimidation. The court ordered the 31-year sentence be served consecutively. In its oral pronouncement of the sentence, the District Court explained the reasons for the sentence including Jones' significant history with the court; his prior case history, which involved

5

offenses with a weapon; the court's inability to protect the community; and his age and unemployment. The court continued:

> The reasons that the [c]ourt gives is that you've had two deferred sentences that have involved significant work on your behalf by the mental health community and by the attorneys both state and defense; that you've had the opportunity to continue with some of that; that you chose not to, and that the [c]ourt allowed you to withdraw your plea after you actually had the mental health type of a commitment, but you've gone forward with this; that you were convicted by a jury; that you've not accepted responsibility for the conduct; that these were violent offenses and there was the use of weapons; there were multiple victims in these cases and particularly in this case two people with whom you lived; that I can't protect those people under those circumstances.

> And you also received the benefit of a reduction of the charge in Count I on this one by the jury where they did not find you guilty of strangulation, so that I believe that the jury verdict took into account all of the conduct that they saw and heard during the course of this trial; that in the presentence report in this matter it's the first time in my entire time on the bench that they've used these risk assessment information that I've seen that they demand listed as areas of risk requiring intervention. Every single slot, criminal history, educational, employment, financial, family, social supported (inaudible) problems, substance abuse, peer associations, criminal attitude, and behavior patterns, are all identified as a high end.

The court concluded that after considering the circumstances, the court's significant involvement, and Jones' prior criminal history, including felony charges of Criminal Endangerment, Burglary, and Theft, it could not continue sentencing Jones as it had in the past. The court determined that sentencing Jones to Montana State Prison was the only solution that kept the community safe. Jones did not object to the sentence imposed or the District Court's reasons for the sentence.

6

¶11 In its written judgment, the District Court listed twelve reasons for the sentence.

1. It conforms to the maximum punishment allowed by law;

2. Provides the Defendant treatment;

3. Provides punishment to the Defendant;

4. It takes into account the criminal history of the Defendant;

5. It takes into the account the violent nature of these offenses;

6. It takes into account the use of a weapon in this matter and the history of using weapons in assaults;

7. It acknowledges the Defendant's lack of accountability, acceptance of responsibility and lack of remorse;

8. It acknowledges that the Defendant insisted on withdrawing his guilty plea after the Montana State Hospital said he was not suffering from a mental disease or defect that would prevent him from understanding his criminality which was how the Defendant was able to escape responsibility for a prior violent crime;

9. It takes into account the victims were family members who were allowing him to stay with them and provide for him;

10. Provides protection for the community;

11. It takes into account the Defendant's mental health and the evaluation by the Montana State Hospital; and

12. It takes into account this is the first time the Court has ever had a PSI Risk Assessment of High for every category.

¶12 The first issue raised on appeal is whether the prosecutor's comment in closing argument that Jones' mother was being "abused again" by having to testify against him, infringed on Jones' constitutional rights. Jones argues the comment improperly inflamed the passions of the jury and was an improper appeal to the sympathies and passions of the

jurors. He argues the comment undermined his constitutional rights to a jury trial, to confront adverse witnesses, and to due process. Jones argues the improper comment warrants plain error review and reversal.

¶13 We generally do not address issues of prosecutorial misconduct pertaining to a prosecutor's statements not objected to at trial. *State v. Aker*, 2013 MT 253, ¶ 21, 371 Mont. 491, 310 P.3d 506. However, this Court may review an unpreserved claim alleging a violation of a fundamental constitutional right under the plain error doctrine where the defendant established failing to review the claimed error may result in a manifest miscarriage of justice, leave unsettled the question of the fundamental fairness of the trial or proceedings, or may compromise the integrity of the judicial process. *State v. Taylor*, 2010 MT 94, ¶¶ 12-13, 356 Mont. 167, 231 P.3d 79. Plain error review is discretionary and exercised "sparingly, on a case-by-case basis, according to narrow circumstances, and by considering the totality of the circumstances." *State v. Haithcox*, 2019 MT 201, ¶ 23, 397 Mont. 103, 447 P.3d 452 (citing *Aker*, ¶ 21; *State v. Williams*, 2015 MT 247, ¶ 16, 380 Mont. 445, 358 P.3d 127).

¶14 "Both the Sixth Amendment of the United States Constitution and Article II, Section 24[,] of the Montana [C]onstitution guarantee criminal defendants the right to a fair trial by a jury." *State v. Walton*, 2014 MT 41, ¶ 13, 374 Mont. 38, 318 P.3d 1024 (quoting *State v. Hayden*, 2008 MT 274, ¶ 27, 345 Mont. 252, 190 P.3d 1091). A prosecutor's misconduct "may be grounds for reversing a conviction and granting a new trial if the conduct deprives the defendant of a fair and impartial trial." *Walton*, ¶ 13 (citations and internal quotation marks omitted). We will not presume prejudice from the

8

alleged misconduct, rather, the defendant must demonstrate, based on the record, that the argument or improper comment prejudiced his or her right to a fair and impartial trial. *Walton*, ¶ 13. This Court does not isolate the challenged comment upon review but evaluates the comment in the context of the trial and the closing argument as a whole. *State v. Christensen*, 2020 MT 237, ¶ 79, 401 Mont. 247, 472 P.3d 622.

¶15 Certainly, when viewed as an isolated comment, an argument can be made that the prosecutor's comment was improper. Jones correctly points out that the prosecutor's comment was not only unnecessary, but it had no basis in evidence or relevance to the November 2017 incident. However, defense counsel did not object to the statement at trial. Absent an objection, the alleged error is not appropriate for review. Moreover, when evaluated in the context of the argument as a whole, we are not convinced that the single improper comment by the prosecutor resulted in a miscarriage of justice or compromised the integrity of Jones' trial or the judicial process. After reviewing the totality of the circumstances in this case, we conclude the challenged comment made during the State's rebuttal closing argument does not rise to a level sufficient to invoke the plain error doctrine.

¶16 The second issue Jones raises on appeal is whether the District Court violated his constitutional rights by basing his sentence, in part, on Jones' decision to withdraw his guilty plea and Jones' refusal to accept responsibility for the conduct of which he had been convicted. Jones argues the court unconstitutionally punished him for withdrawing his guilty plea and insisting on a trial, and for maintaining his innocence and refusing to admit guilt.

¶17 The Court reviews a sentence of incarceration of a year or more for legality. *State v. Champagne*, 2013 MT 190, ¶ 17, 371 Mont. 35, 305 P.3d 61. We review de novo whether a district court violated a defendant's constitutional rights at sentencing. *State v. Haldane*, 2013 MT 32, ¶ 17, 368 Mont. 396, 300 P.3d 657. Although Jones raises this issue for the first time on appeal, this Court may review the issue under *State v. Lenihan*, 184 Mont. 338, 602 P.2d 997 (1979), or plain error. In *Lenihan*, 184 Mont. at 343, 602 P.2d at 1000, we decided that an appellate court may "review any sentence imposed in a criminal case, if it is alleged that such sentence is illegal or exceeds statutory mandates, even if no objection is made at the time of sentencing." Jones does not argue his sentence exceeds statutory parameters, but rather invokes *Lenihan* by alleging the sentence is in violation of his due process rights.

¶18 "District courts may consider any relevant evidence relating to the nature and circumstances of the crime, the character of the defendant, the defendant's background history, mental and physical condition, and any evidence the court considers to have probative force" when sentencing a defendant. *State v. Otto*, 2017 MT 212, ¶ 11, 388 Mont. 391, 401 P.3d 193 (citations and internal quotation marks omitted). Here, the District Court supported its sentence with careful consideration of many relevant sentencing factors, including the violent nature of the offenses, the nature of Jones' familial relationship with the victims, prior violent assaults with a weapon, his failure to change his conduct pursuant to prior sentences, protection of the community, and Jones' mental health condition. The challenged comments give context and help explain the District Court's extensive history with Jones in this and prior cases, the various efforts of

10

the court and the State to account for any of Jones' mental conditions, and the unsuccessful efforts previously made to provide Jones opportunities to conform his conduct without incarceration. Despite the court's references to Jones' withdrawal of his guilty plea and his failure to accept responsibility for his conduct, nothing in the record supports Jones' assertion that the District Court relied "in large part" on these two reasons when sentencing Jones. Though a district court must not give "improper weight" to a defendant's "failure to plead guilty," *United States v. Stockwell*, 472 F.2d 1186, 1188 (9th Cir. 1973), nothing in the record indicates these two reasons significantly outweighed any other stated reason for the sentence.

¶19 More so, the challenged reasons do not show an intent to punish Jones for going to trial, which is necessary to support a due process violation. *See State v. Baldwin*, 192 Mont. 521, 526-28, 629 P.2d 222, 225-26 (1981). As to the court's reference to Jones' lack of accountability, acceptance of responsibility, and lack of remorse, this Court has held that "a defendant's lack of remorse may be gleaned, without more, from the manner of the commission of the offense as demonstrated by the evidence at trial or from other competent evidence properly admitted at the sentencing hearing." *State v. Shreves*, 2002 MT 333, ¶ 21, 313 Mont. 252, 60 P.3d 991. "[A] trial court can consider as a sentencing factor a defendant's lack of remorse as evidenced by any admissible statement made by the defendant pre-trial, at trial, or post-trial." *Shreves*, ¶ 21. If a court does choose to sentence a defendant based upon lack of remorse, it may not infer lack of remorse from a defendant's silence and instead must point to affirmative evidence in the record demonstrating lack of remorse. *State v. Rennaker*,

2007 MT 10, ¶ 51, 335 Mont. 274, 150 P.3d 960; *see also, State v. Duncan*, 2008 MT 148, ¶¶ 51-54, 343 Mont. 220, 183 P.3d 111. After his conviction and prior to sentencing, Jones submitted two letters to the District Court in which he repeatedly blamed his mother, one of the victims, for the offenses in this case and other matters in his criminal past. The record sufficiently supports the court's reliance on Jones' demonstrated lack of remorse, lack of accountability, and failure to accept responsibility. The court explained in detail its extensive experience with Jones in this case and prior criminal cases where the efforts made to minimize Jones' sentences did nothing to prevent future harm to others.

¶20 The court's explanation for the sentence simply included overwhelming reasons to support its sentence. The challenged reasons in Jones' sentence did not violate Jones' due process rights and therefore Jones is not entitled to relief under *Lenihan*. Because his sentence did not implicate his due process rights, we decline to exercise plain error review.

¶21 We have determined to decide this case pursuant to Section I, Paragraph 3(c) of our Internal Operating Rules, which provides for memorandum opinions. In the opinion of the Court, the case presents a question controlled by settled law or by the clear application of applicable standards of review.

¶22 Affirmed.

/S/ LAURIE McKINNON

We concur:

/S/ MIKE McGRATH
/S/ JAMES JEREMIAH SHEA
/S/ INGRID GUSTAFSON
/S/ DIRK M. SANDEFUR